We're going to move now to Case No. 2 of the morning, 22-2954, Michelle Fitzgerald v. Roncalli High School in the Roman Catholic Archdiocese of Indianapolis, Inc. We'll begin with argument from Ms. Heibel. Good morning, and may it please the Court. Gabby Heibel for Appellant Shelley Fitzgerald. The District Court ignored the Supreme Court's functional, fact-intensive ministerial exception test. Despite finding myriad disputes of fact, it held that boilerplate language in a contract made those disputes immaterial. The District Court erred because it misunderstood Starkey, but Starkey simply held that an employee cannot avoid a ministerial label by failing to perform the religious duties assigned to her. Here, Fitzgerald shows that Roncalli never entrusted her with religious duties. When the school did expect employees to perform religious responsibilities, it told them so explicitly and it provided them with religious resources and with religious training. It never did that with Fitzgerald. I'd like to start today by addressing Starkey, and then I would be happy to turn to Roncalli's other statutory and constitutional arguments. First, the ministerial exception does not apply, and this case is different from Starkey. In Starkey, all evidence supported Roncalli on what she was entrusted to do, but on this record, a reasonable fact-finder could infer that Fitzgerald was never expected to perform religious duties, and there are three categories of evidence that I'd like to address. First, before you do that, do you agree that it would have to be never entrusted to perform religious duties, that if there are some acts that she performed, some of her duties that clearly show she had some role in performing religious duties, that that is sufficient to affirm? No, it's not a test of whether or not she was never entrusted to perform religious duties, and I think the Supreme Court makes that clear when it talks about the fact that the ministerial exception analysis is about who are the people who are specifically expected to be leaders, teachers, and preachers in the faith. It's not everyone. It's not... If you're suggesting a higher level, how do you explain the organist, then, who is determined to be...the ministerial exception would apply to the organist? I think there's a difference here between, in the organist situations where this court has said that music is important to a religion, and it's not the court's duty to decide whether or not something is central to a religion, or whether or not something is a religious duty. When somebody's entire job is playing music, and the religious institution says playing music is a religious duty, then that makes the majority of that person's job a religious responsibility. But if you have somebody who maybe is a janitor, and sometimes when he sees students walking in the hallway, he says, have a blessed day, that can't transform a janitor into a minister. It's this fact-intensive test where the court is supposed to decide, is this person interested with so many religious responsibilities that the religious employer sees them as a preacher, a teacher, a leader in the faith? If we move beyond the contractual documents, and what the contractual documents incorporate, doesn't Ms. Cheryl solve a problem because of her involvement in seeking the pay increase for the guidance counselors, and for being involved in the evaluation program? The record on that seems to indicate that she's involving herself in religious activities. First of all, I'd like to just make clear, we're not the ones seeking summary judgment here. It's Roncalli that's seeking summary judgment. And here, we have more than shown that there is a dispute of fact, but then I'd like to also address each of those pieces of evidence in turn. It was Starkey, not Fitzgerald, that sent the email to the principal about the ministerial duties listed in the teacher's contracts. And Ms. Fitzgerald's name is on it, but she disputes whether or not she signed it or agreed to it? Yes, she says that she did not see it, and Starkey did not reach out to her before sending it to the principal. Well, we know she saw it, because she responded wonderful to it. She saw it after it was sent, but she didn't see it before it was sent. And when she responded wonderful, she was saying thank you for supporting a pay increase and thank you for not advocating for us to be put onto an hourly wage where we wouldn't get paid in the summer. So she was addressing his support for their pay structure, not for any of the ministerial duties. And turning to the CEAP evaluations, a few points on that. First of all, she asked the principal that they be allowed to remove the religious criteria from the CEAP evaluations, because she thought that it didn't actually reflect her job duties. And the principal said no, not because he thought it reflected their job duties, but he thought it would be unfair to the teachers for the guidance counselors to have a shorter evaluation that removed a metric from the evaluation. And I think the important thing to look at in the CEAP evaluations is everything else that's included and how it actually played out for Fitzgerald. Ms. Heibel, are you suggesting that Mrs. Fitzgerald had no religious responsibilities or just less than Starkey? We're suggesting that she had no religious responsibilities. She may have a couple of times because she's at a religious school and she's in a religious environment and she may have talked to her principal about religion in a personal context and she might have gone to religious services as an attendee, but she was not expected to perform religious responsibilities. And the three categories of evidence really make that clear. Unlike Fitzgerald, teachers were told to pray with students once a week. They were provided prayer books for that very purpose and they were sent to religious trainings. Fitzgerald was never told to pray. She wasn't provided any religious resources. But it sounds like you're just arguing that there's evidence that others may have had more religious duties. I think a fact finder could say, when we look at how Roncalli treated teachers, we see that's how it communicated to them that they had religious duties. That's the way that, that's the setup Roncalli established for communicating, here are your religious duties. The fact that it didn't do that with Fitzgerald, a reasonable fact finder could conclude that means that she didn't have religious responsibilities. You can also look at... Isn't that though, just asking the court really to engage in an analysis that the ministerial exception is there to prevent, to get us to engage in what is religious, what is considered ministerial, something that the whole exception is designed just to lead to the religious organizations? No. Fitzgerald doesn't dispute that praying with students is a religious responsibility. She disputes that that was actually a responsibility that was entrusted to her. So Roncalli is free to identify what responsibilities it believes are religious, but it then has to actually show that those duties were entrusted to Fitzgerald. And here, it has not shown beyond a dispute of, a reasonable dispute of fact that Fitzgerald was actually entrusted with religious duties. Ms. Heibel, there's a lot of debate in the briefs concerning 702A and the religious exemption. What are your thoughts on that? Yes. We think that section 702 narrowly allows religious employers to discriminate against individuals of a particular religion. So just a co-religionist, is that where that exception should be limited according to your position? Yes. Fitzgerald would not be able to bring a lawsuit against Roncalli if it fired her for not taking communion, but section 702 doesn't do anything to her ability to bring a sex discrimination case. And that's true because section 702 parallels the structure of section 703. Section 703 says that employers may not discriminate based on such individuals' race, color, religion, sex, or national origin. And section 702 says that religious employers may discriminate against individuals of a particular religion. So both focus on the individual employee's protected characteristic, not the employer's protected characteristic. And holding otherwise would create a circuit split, and it would strip civil rights from millions of employees. Well, the Third Circuit has ruled in the broad way. So I don't know if it would create a circuit split, but you're arguing to us to not take the definitional approach, not take the Third Circuit approach, and just take the narrower approach of the individual's religion for that interpretation of 702A. We want the narrower approach, but I would disagree that we're disagreeing with the definitional approach. By looking at subsection J and the definition of religion, Roncalli can only make its argument by ignoring that second clause beginning with unless. And this isn't just a grammatical point we're making. The unless clause changes and narrows the definition of religion there and makes clear that it's about the employee's religion. What about the EEOC guidance on that? So the EEOC guidance is not binding, and we think that it is simply wrong on the textual interpretation of Title VII. The Supreme Court made clear and partisan that subsection J was added to protect employee's religion and their religious practice, not to create a license for religious employers to discriminate. And that's exactly what Roncalli's interpretation of Section 702 would do. Partisan is obviously up in the air, though, because of Groff, right? But its explanation of legislative history, I don't think, is in dispute. And I do want to be clear that what Roncalli is urging is a rule that would allow a religious hospital to pay men more than women based on a religious belief that men should be the head of household, and to allow a religious hospital to fire a food service worker if she got pregnant or entered into an interracial marriage. That simply cannot be the law. And if I may, I'd just like to— Interracial or same-sex marriage? Both. If I may just return briefly to why we think that the district court was wrong on the ministerial exception analysis. We think that our briefs do sufficiently outline all of the disputes of fact here. Her performance evaluations made clear that she wasn't interested with religious duties. The school communicated to teachers that they should send students to— I'm sorry to interrupt. I know you want to get the point said, but how do you get around, in light of our decision in Starkey, your client's role on the administrative council? So, in Starkey, she didn't introduce— Sorry, let me go back. This court held that all evidence pointed in favor of Roncalli in Starkey. Here, Fitzgerald introduces evidence showing that she didn't contribute to any sort of discussion on the administrative council, and others also disputed Roncalli's explanation that the administrative council was a religious leadership body in the school. If you look at the minutes, though, that are in evidence, they opened in prayer. They talk about supporting planned religious details of religious services. They're picking out music. If you look at the contemporaneous notes of the meetings, they are making religious decisions. And she was present during those meetings. I think that our briefs go through and sort of explain each piece in detail, but also, this was a body in a religious school where there were a lot of other people performing religious duties. There was the music teacher who was deciding which music should be performed in religious services. There were people on the council whose job was to discuss religion and address religion at the school. And when they got in the same room, sometimes it was most convenient for them to address religion. But Fitzgerald was there to address things like scheduling, like standardized testing. So although she disputes that the administrative council was actually an important religious body for the school, to the extent that it did discuss religion, that's not why Fitzgerald was there. She was there to address logistical issues and standardized testing. I noticed that I'm running low on time. I'd like to reserve three minutes. If that's all right. Very good. That will be granted. Thank you, Ms. Heibel. We'll now move to Mr. Davis. Good morning, Your Honors. And may it please the Court. My name is Joe Davis, and I represent the defendants, the Archdiocese of Indianapolis and Roncalli High School. Your Honors, this case is fully controlled by Starkey, where this Court, 10 months ago, held that a plaintiff occupying exactly the same position, at the same school, at the same time, was covered by the ministerial exception. Under Starkey, the ministerial exception bars all the plaintiff's claims here, and the district court's judgment should be affirmed. But even if there were some daylight between this case and Starkey, on the ministerial exception, and there isn't, but even if there were some daylight, then the plaintiff's claims would still be barred under numerous other protections for religious freedom, including Title VII's express statutory religious exemption, and including the First Amendment protections for church autonomy and expressive association. Let's start with the 702A. Your thoughts on that. Yes, Your Honor. The 702A exemption, the religious exemption, clearly bars Fitzgerald's claims as a matter of the plain text, as a matter of precedent, as a matter of structure. I'd like to start with the text. That's the appropriate place to start. And plaintiff just now inaccurately quoted what the text actually says. What it says is, this subchapter shall not apply to a religious employer with respect to the employment of individuals of a particular religion. So all of that is important. This subchapter, that means all of Title VII. It doesn't just mean their prohibition on religious discrimination. Religion is a defined term under the statute. It means not just belief, it means not just denominational affiliation, but all aspects of practice or observance. It is a religious practice or observance, as Judge Easterbrook pointed out in Starkey, in the Catholic Church to avoid same-sex marriage, and it's undisputed that the plaintiff here does not adhere to that religious practice or observance. So if you just walk through the text, 1, 2, 3, the plain text of the statute bars the claims that are issued here. How far does that reasoning go? What are we to do with a racial discrimination or a sexual discrimination case which might not be covered by the ministerial exception, but be in a religious high school? Well, just to take one of the examples that you just heard from the plaintiff, she said that if an employer had a religious belief that men should be paid more than women, then they could be covered under the exemption. That's actually not accurate. That's not our view of how the exemption works. There's a Ninth Circuit case that involves that scenario called Fremont. I think it's cited in some of the briefs. But the problem with that claim is it's not based on the employee's individual religion, the employee's practice or observance. That's just the employer saying, this is my practice or observance. We don't think that's right. You have to pay close attention to what the text of the statute says. Here, it's the employee's practice or observance that matters. Fitzgerald's rejection of the Church's teaching on same-sex marriage. I'd like to talk about precedent as well. If we get to your other defenses, is that something we should send back to the district court to determine in the first instance? Or should we address them? And if so, why? No, Your Honor. You don't need to send it back. Certainly, on the Title VII exemption, there's no dispute about the doctrinal basis for the decision here. The district court didn't say the Title VII exemption was premature.  here are offering. It's a legal question whether this decision, given its doctrinal basis, is covered by Title VII or not. And we say it's not. So this court can clearly reach that. And in the reply brief, I think Fitzgerald acknowledges the plausibility of the religious justification here is not at issue. So the question is, is it covered by Title VII or not? Is it fair to say that we would be joining a minority of the circuits, though, if we took your interpretation of the exemption? No, Your Honor. The circuits that have squarely addressed this question about basically whether the exemption can apply to sex discrimination claims or not, is it limited to religious discrimination claims? Or can it apply to claims of other types of discrimination? Those circuits go our way. I'd point you to the Fifth Circuit's decision in the EEOC versus Mississippi College. And I think, importantly, the Third Circuit's decision in Curry-Kramer that Judge Brendan raised in the prior argument. And Curry-Kramer, it's on all fours. You've got an employee at a Catholic school bringing a sex discrimination claim after she was let go for publicly rejecting the church's teachings on abortion. Mr. Davis. In this case. Mr. Davis, what's your strongest point on the religious activities by Ms. Fitzgerald? Strongest point on the religious activities? Oh, talking about the— What has she done in the context of her work that you suggest not might but actually affects the religious mission of the school? I have a number of points about that. The points that Starkey found dispositive— Because we can't just go by title, right? No, I don't think you can just go by title. But I think you can go by the school's expectations that she perform religious duties. Those expectations are embodied in the contract. What if there's expectations but they're not met? In other words, she doesn't participate in the religious mission of the school. Well, Starkey addresses that question precisely. And it says an underperforming minister is still a minister. But I think the minister— Well, you can't call anybody a minister just because the school labels it a minister. You can't label the bus driver a minister. You can't label the janitor a minister. You can do it, but it can't be recognized in the law. This Court has said in Strelinsky and elsewhere, if you do that, you're inviting a claim of subterfuge. And we're certainly not doing that, Your Honor. That's exactly correct. What we are saying is that the facts that this Court found material in Starkey, every single one of them, I think there were really four that generated— But Starkey was more involved than Fitzgerald. Would you acknowledge that? No, Your Honor, I wouldn't. In fact, I think this case is, if anything, even easier than Starkey. And I say that for a couple of reasons. One is that here, although both Starkey and Fitzgerald were subject to the religious evaluation criteria under the— CEAP is what we've been calling it, the Catholic Educator Advancement Program. Here you have Fitzgerald actually going through that process herself and holding herself out as, in fact, discharging the religious duties that the school imposed on her. She said, I engage in personal and social counseling. That's an important part of my daily work. She said that in doing that, I discuss faith formation with students. And she said, in fact, that I consistently use spiritual life and resources in my counseling conversations, as well as discussing my own spiritual experiences. So Fitzgerald is telling the school that, yes, I have these religious duties, and I'm, in fact, discharging them. So if an underperforming minister is still a minister, then certainly— Yeah, but is there any suggestion that those views deviate from the mission of the church or the school? I'm sorry, Your Honor. You say she signed on to an agreement to represent the mission of the school. Through these various agreements that she signed. I'm saying to you, is there any evidence that she did anything contrary to that mission? Do we have evidence in her guidance position that she influenced students in a way that is a deviation from the mission of the school or the church? Certainly, Your Honor. That's how this case got here. It's the archdiocese holding her accountable for failing to uphold the religious mission of the school. That's why— In what way? Just because of her sexual orientation? No, Your Honor. It's because of her rejection of the church's teachings on marriage and entering into a relationship that's contrary to those teachings, which the contract specifically says that she shouldn't do. But I think— So her example of her lifestyle is what's contrary— that's contrary to the mission, right? Your Honor, guidance counselors' issues of sexual orientation and the church's teachings on these matters are within the bailiwick of the things that could come in front of a guidance counselor. No, I appreciate that. I appreciate that. So I just want to be clear on what it is that she has done in her role to deviate from the mission of the church or the school,  Not her status, Your Honor. entering into a relationship that's contrary to the teachings of the Catholic Church. And this court said in the CLS v. Walker case, there is that distinction there. Whether it's a distinction under Title VII or not, there's a distinction in the church's beliefs on this issue. But to the point about what has she done, I think Judge St. Edith's point about the administrative counsel is really important here because just like Starkey, Fitzgerald was a member of this small group of select Roncalli employees that were charged with overseeing the school's operations, including those bearing directly on the school's religious mission. What's the test in terms of how much of her job has to be religious? I think even you would agree that at least there's an issue of fact about her day-to-day activities and whether or not they were secular. So where's the line in terms of how much of what she does has to be considered religious based on the record? Well, we know for sure the theory that's being pressed to you by the other side that her duties were primarily secular. That can't possibly be right because the Supreme Court rejected that exact argument in Hosanna Tabor and then again in Our Lady of Guadalupe. So what the court said in Our Lady of Guadalupe was if you're tasked with helping carry out the duty of passing on the faith to the next generation, participating in religious education at a Catholic school, then you are within the ministerial exception. And that's what the employment contract here does. From your viewpoint, Mr. Davis, it doesn't have to be all of the activities or the main part of her job as long as she has some duties that involve carrying that out? There is no primary duties, Tess. That's exactly right. As a guidance counselor, she was in a position to influence students on these matters that are at the core of the Catholic faith and the Archdiocese has a right to expect her to do that. So how do we articulate a standard for how much of her job has to be non-secular? I don't think it's a question of how much. It's not a question that can be answered with a stopwatch as Justice put it in Hosanna Tabor. The question is, was she tasked with helping to carry out, helping to form the next generation in the Catholic faith? And I think you should look to the ministry description which specifically lays out how she was tasked with doing that. It says that she's supposed to communicate the Catholic faith through the counseling curriculum. It says she's supposed to bring church teaching to bear in counseling conversations. She's supposed to pray with and for students. And you look at the Angela Maley Declaration, which makes very concrete exactly how that works, how it is carried out in the context of the guidance counselor at Ron Hall. Although I think the declarations or the testimony from some of the other counselors would raise an issue of fact on that. In this particular case, which we didn't have at Starkey. Oh, you did have that at Starkey, Your Honor. You have the same declarations by exactly the same declarants. Every single one of, you go down the list, all the same employees that Fitzgerald has put in front of you here also filed declarations at Starkey. And I think to that point, the arguments that you just heard from plaintiff are exactly the arguments that were raised in Starkey. Just go down the list. She said that other administrative council members handled all the religious items, not me. Starkey said exactly the same thing at pages 25 through 26 of her brief. Fitzgerald says that, Ron Colley, although they gave me the ministry description, they never gave me specific religious instruction on how to implement the ministry description. Starkey said exactly the same thing. That's at page 29 of her brief. Fitzgerald says, when I told Principal Weisenbacher, when Starkey told Principal Weisenbach that guidance counselors had all these ministry duties, they were just motivated by economic. They wanted to protect summer pay. Starkey said exactly the same thing at page 28 of her brief. So these arguments, I mean, this is a rejection of Starkey more than it is a distinction of Starkey. But I would like to address the administrative council briefly, Your Honor, because it's an independent basis for what this court held in Starkey. It said Starkey was a minister of both because she was charged with doing religious counseling, or bringing the church teaching to bear in counseling, also because she was a leader of the school. And we know from Our Lady of Guadalupe that religious leaders are, in fact, ministers. And if you look at the administrative council meeting minutes, it's quite clear that items that the archdiocese would consider to be at the core of the school's religious mission were discussed at the administrative council meetings. And Principal Weisenbach testified that he wanted everybody to weigh in on these matters, to bring their own expertise to bear on them. So these are things like, who should be in charge of the music at mass? Should it be the music director or the nun? Because we're worried that the students aren't engaged enough. That's core religious material. Should we discuss the charisms of St. John XXIII on our website when we're talking to the public about what Roncalli is all about? This is core religious mission stuff. Mr. Davis, on the 702 issue, should some type of a pretext inquiry apply to the employer's proffered religious reason for what's termed to be the adverse employment action? Well, you wouldn't need it here, Your Honor, because I think everybody agrees. Fitzgerald does not adhere to the church's teachings on marriage. The church's teachings on marriage is what it is, and that's why she was let go. That's the stated reason. And Fitzgerald tells you in her reply brief that the plausibility of that justification is not at issue. So the court wouldn't have to address that question. That actually makes this a very clear and easy case for addressing the Title VII exemption, which I think is really important for the court to do. Cases like this one are exactly why we need to pay attention to what Congress has said about the sort of cases that simply aren't Title VII cases in the first place. And I would like to briefly address the one textual argument that we heard from the plaintiff about the Title VII exemption, about the unless clause. So she says, because of the unless clause, the definition of religion doesn't actually apply to the religious exemption at all. But at the onset, that can't be right, just as a plain textual matter, because the definition of religion appears in, it's headed up at the top of the statute. Congress wrote, for purposes of this subchapter, religion shall mean X. And then we have the word religion in the religious exemption. So she's rejecting the plain text of the statute when she says the definition of religion in the subchapter does not apply to the use of the word religion in the religious exemption. That can't be right. On the unless clause, she says it changes the meaning of the first half of the definition. No, it doesn't do that. What it does is it states a condition under which the first half of the definition doesn't apply. So the first half says religion includes not just belief, but practice or observance. The second half says unless the employer shows that accommodating a practice or observance would be an undue hardship. So if the employer makes that showing, religion no longer includes practice or observance. Why did Congress do it that way? It's because the second half is stating an affirmative defense to claims of religious discrimination. So the definition is doing two things. It's a broad definition of religion, and then it's an affirmative defense to a particular type of Title VII case. That's not an issue here. We haven't made that showing. The unless clause is important, but it's irrelevant in this case. And I would direct the court, she didn't raise this argument to the reply, so we didn't get to cite this case to you. But this court said exactly that in the Adeyeye case, where it said that the religion definition does two things. Combines a broad, substantive definition of religion with an affirmative defense for failure to accommodate claims. This court would, in fact, be splitting from Curry-Kramer. I think I'd gotten halfway through my analogy to that case previously. But this case, just like that one, involves a Catholic school employee let go of a publicly rejecting the church's teachings. Just here, the church's teachings on a different topic. I'd be asking the court to affirm. Thank you, Mr. Davis. Ms. Heibel, why don't you come forward? We're going to give you a little bit of extra time. We'll give you four minutes. You're welcome to argue. Thank you. First, I would like to point the court to the Judge Young's opinions in both Starkey and Fitzgerald. I think looking at the difference between the two opinions really highlights the change in the factual record in both cases. In the district court's opinion here, unlike in Starkey where the district court said there's no dispute of fact, here he spent 11 pages outlining disputes of fact and then said none of that matters because of a couple of boilerplate lines in a contract. And that's completely contrary to what the Supreme Court has said, whereas repeatedly instructed courts to apply a fact-intensive and functional analysis to the ministerial exception. The district court seemed to heavily rely on the contract. Would you agree with that? Yes. I believe that the district court's opinion is almost exclusively based on the contract. And that is not in line with what the Supreme Court has laid out. Second, we don't dispute what duties count as religious. Praying with students is a religious duty. But we do dispute the fact question of whether Fitzgerald was actually entrusted with that responsibility. Roncalli is asking the court to draw all factual conclusions in the school's favor on that question, and the court can't do so. At the summary judgment stage, where it is Roncalli, not Fitzgerald, seeking summary judgment. Ms. Heibl, I'm trying to think through what a Catholic high school would look like if Ms. Fitzgerald here is not engaged in any religious duties. Is it Catholic in name, then certain subjects are taught by individuals with different contracts, and then the theology or religion is taught by individuals with different contracts than math and science? And are they in different wings of the building? I'm trying to think through what that would look like. I think here at Roncalli, the religion teachers and the priest and the religious sisters are probably on the furthest end of the spectrum of who is a minister, who has religious duties, who students are supposed to turn to. And then you have math and science and maybe English teachers who are told to pray with students, are sort of seen as a resource sometimes, but aren't as much a minister and don't have as many ministerial duties as the religion teachers. And then on the other end of the spectrum, you have the guidance department, where the school explicitly told teachers, if students have religious questions, send them to the priests, send them to religion teachers. If students have academic questions, send them over to the guidance department. Their job, their responsibilities are about getting students into college, not about providing them any spiritual support. And if the school really did expect them to provide spiritual support, it would provide them with religious training like it did with teachers. And about the administrative council, I would point the court to pages 10 and 11 of our brief, where we really outlined why the administrative council, why Fitzgerald's participation on the administrative council was not a religious responsibility, it was other councils and other bodies at the school that made the majority of religious decisions. There you come back to the majority again. But I don't think you would dispute that the administrative council itself made religious decisions. I think that they're looking at the minutes, the contemporaneous minutes. I don't know how there could be an issue of fact on that. Fitzgerald explains in her declarations that when the administrative council was touching on religious practices and religious events, it was logistical things like where should people park. And sure, there might have been times when a religious leader at the school, a religion teacher or a priest would use the administrative council as an opportunity to chat with the principal. The minutes of it certainly show more than just where to park though. And I don't know how you can get around. The council itself, I understand she's saying she wasn't involved in some of those decisions, but given the record and the contemporaneous notes, I don't know how you could get around that. I think that we outlined in our brief all the ways in which her contributions were exclusively secular and logistic. And just one final point. Title VII, this subchapter is modified by the rest of the subsection when it says with respect to an individual's religion. What this subchapter does is just ensures that hiring and firing and training and pay discrimination are all covered, not that all forms of discrimination are permissible. My goodness. Subchapter. Ms. Heibel, there's no question, is there, that Ms. Fitzgerald gave some guidance to students in her role as a guidance counselor, right? So you have academic guidance. Yeah, so let's assume we have a situation where a guidance counselor situated as Ms. Fitzgerald is wants to talk about going to college. And is of the view that if at all appropriate in this case of this student, the guidance counselor says, well, I think you might want to consider a Catholic-sponsored or Catholic-run university because it'll continue your efforts in the faith. I'm not saying that Ms. Fitzgerald did that, but if somebody in that position were to do that, that'd be a ministry, wouldn't it? I think that might be a piece of evidence that might weigh. Well, what if we have more discovery here? And that's what comes out where all the students that have interacted with Ms. Fitzgerald, one of them were to say, well, we discussed various universities and Fordham, St. John, some other schools thought appropriate in part because of the faith. And you see, that's the real challenge here to move from just a label to the subset of what kinds of discussions are had by anyone who, quote, is a leader in a Catholic institution. Two things. First, there's no evidence of that in the record. What is in the record? No, I'm not suggesting that's in the record. But I do think it's important that when Fitzgerald had students who came to her and said, I want to pursue a religious career, she was explicitly told, don't talk about that with them. Send them to the priest. The priest on campus is the one who will give them that sort of guidance. So I do think maybe that would be a closer case, but it's not at all the case here. And I think that, again, this is a fact-intensive test. And so we have to look at everything altogether. And here, especially at the stage when she's opposing summary judgment, she's introduced more than enough evidence disputing that she was entrusted with religious duties. The district court's decision saying a couple formalistic lines in a contract is enough to ignore all of that is simply wrong and contrary to the Supreme Court. Thank you. Thank you. Thank you, Ms. Heibel. Thank you, Mr. Davis. We appreciate your advocacy. The case will be taken under advisement.